**Special Tribunal of the Supreme Court of the State of Colorado**
**2 East 14th Avenue • Denver, Colorado 80203**

---

**2023 CO 44**

---

**Supreme Court Case No. 23SA114**
*Original Proceeding in Discipline*
Colorado Commission on Judicial Discipline Case No. 21-118

---

**In the Matter of Complainant:**

The People of the State of Colorado,

and

**Respondent:**

Nathan B. Coats, a Former Chief Justice of the Colorado Supreme Court.

---

**Order re: Recommendation of the Colorado Commission on Judicial Discipline and Public Censure**
*en banc*
August 7, 2023

---

**Appearing for the Colorado Commission on Judicial Discipline:**
Christopher Gregory, Executive Director
*Denver, Colorado*

**Attorneys for Respondent:**
Burns, Figa & Will, PC
John S. Gleason
Alec Rothrock
*Greenwood Village, Colorado*

**Attorneys for Complainant:**
Rathod Mohamedbhai, LLC
Qusair Mohamedbhai
Omeed Azmoudeh

*Denver, Colorado*


**PER CURIAM**


**CHIEF JUSTICE BOATRIGHT, JUSTICE MÁRQUEZ, JUSTICE HOOD, JUSTICE GABRIEL, JUSTICE HART, JUSTICE SAMOUR,** and **JUSTICE BERKENKOTTER** did not participate.

¶ 1     Former Chief Justice Nathan B. Coats, you appear before the Special Tribunal

of the Colorado Supreme Court ("the Special Tribunal") for imposition of discipline

based on violations of the duties of your office as a Justice of the Colorado Supreme

Court.  The Special Tribunal was convened because the Supreme Court was

required to recuse itself in this matter under Rule 41(b) of the Colorado Rules of

Judicial Discipline ("RJD").

¶ 2     The Colorado Commission on Judicial Discipline ("the Commission")

recommends approval of the Amended Stipulation for Public Censure ("the Amended

Stipulation"), which you and the Commission executed pursuant to RJD 37(e).

¶ 3     Consistent with the Amended Stipulation, the Commission recommends that

the Special Tribunal issue a public censure.   The Special Tribunal adopts this

recommendation.

## I.     Stipulated Facts

¶ 4     In the Amended Stipulation, you and the Commission agreed to the following

facts:

> 1. In 2000, Justice Coats was appointed to the Colorado
> Supreme Court, where he served as an Associate Justice
> until he became the Chief Justice on June 30, 2018.  As
> provided by the Colorado Constitution, "the supreme
> court select(s) a chief justice from its own membership to
> serve at the pleasure of a majority of the court, who shall
> be the executive head of the judicial system."  Colo. Const.
> Art. VI, sec. 5(2).

1

2. Also by constitutional mandate, the Supreme Court appoints a State Court Administrator, Colo. Const. Art. VI, sec. 5(3), who by statute is responsible to the supreme court and who, in addition to the other duties dictated by the legislature, is directed to perform the duties assigned to him by the chief justice and the supreme court. Sec. 13-3-101(1), C.R.S. The State Court Administrator is also directed by statute to employ such other personnel as the Supreme Court deems necessary to aid the administration of the courts. Sec. 13-3-101(2), C. R. S.

3. In or around August of 2018, Justice Coats was briefed by Christopher T. Ryan, the State Court Administrator, of allegations that Mindy Masias, the Chief of Staff and second in command of the State Court Administrator's Office ("SCAO"), who had narrowly failed in her bid to be appointed State Court Administrator in the previous year, had falsified the date of an invoice in connection with a request for reimbursement for two chairs purchased for the Judicial Department rather than simply refiling her request on forms for the next fiscal year, as ordered by the SCAO Controller. Justice Coats also learned there was no apparent financial gain in Masias's decision to falsify the date of the invoice, given that she would have been entitled to the reimbursement with or without falsification.

4. Around the same time, Justice Coats, Ryan, and Andrew J. Rottman, Counsel to the Chief Justice, determined that if the allegations were true, appropriate discipline could depend upon whether this was an isolated incident of dishonesty or part of a pattern of misconduct. To that end, they decided that an independent employment investigator should be retained to determine whether Masias had actually falsified the date of the invoice, and that Masias's past requests for reimbursement should be audited to determine whether this was an isolated case of dishonesty or part of a pattern of misconduct.

5. David Powell of the law firm of Ogletree Deakins was retained to conduct the independent investigation

2

regarding the falsified invoice and ultimately concluded that, in the absence of direct evidence, he could not find that Masias altered the invoice in question. At the same time, however, he could not find any evidence to support her account of initially returning the items and therefore having received multiple invoices. Notwithstanding Powell's findings, Justice Coats personally concluded that it appeared likely that Masias had in fact falsified the invoice and then continued lying to Powell and SCAO officials to avoid admitting her earlier dishonesty.

6. Tracey Griffith, a member of the SCAO's internal audit staff, produced a memorandum summarizing a broader audit of select requests for reimbursement by Masias, which identified a number of irregularities in Masias's past requests for reimbursement. When expressly queried by Justice Coats, Ryan represented to him and Rottman that the audit had revealed nothing beyond minor errors. Justice Coats asserts that he only learned of the existence of the Griffith memo much later, well after Ryan had resigned.

7. However, on October 5, 2018, Ryan forwarded Justice Coats an email describing the significant negative impact of Masias's conduct on the financial controls of the Judicial Department. The email referenced Griffith's memo as evidence. Justice Coats made no further inquiry into the email or Griffith's memo, an inquiry which may have resulted in his or Rottman's review of additional findings regarding Masias. Indeed, when shown the email much later, Justice Coats acknowledged receiving it but recalled nothing of its contents. Justice Coats stated that had he seen Griffith's memo earlier, he likely would have decided that Masias would be unfit to work for the Judicial Department in any capacity.

8. Justice Coats recalls that, weighing in favor of Masias's fitness to continue work for the Judicial Department, Ryan made clear that Masias was very important to his ability to function as State Court Administrator, in large part

3

because of her experience and long-standing relationships with the chief judges and leadership teams throughout the state. According to Justice Coats, although not typical of personnel matters, considering Masias's high rank in the SCAO, various disciplinary remedies were discussed with Justice Coats, who kept the full Supreme Court apprised of the investigation and options under consideration.

9. During this same period, the SCAO was undergoing the Annual Financial and Compliance Audit conducted by the Office of the State Auditor ("OSA"). While discussions continued concerning appropriate discipline for Masias, Ryan reported to Justice Coats that the Financial Services Division would refuse to sign off on the audit unless Masias's employment was terminated. Ryan also discussed with Justice Coats the enmity between members of the Financial Services Division and Masias. Representing that Masias's continued employment with the SCAO would therefore place him in an untenable position, Ryan nevertheless suggested that Masias could still serve an important role with the Judicial Department as an independent contractor serving in a teaching and coordinating capacity. In response, and after consultation with the full Supreme Court, Justice Coats indicated that if no misconduct by Masias beyond the falsification of the invoice came to light, the Court would consider such a role — Justice Coats understood that if other misconduct by Masias did come to light, the Supreme Court had the authority to foreclose consideration of Masias for any such contract. If the Supreme Court objected to any such contract, and Ryan disregarded the Supreme Court's direction, the Supreme Court would be constitutionally empowered to remove Ryan from office.

10. On November 7, 2018, with Justice Coats's knowledge and approval, Ryan therefore presented Masias with a Notice of Disciplinary Decision. The Notice described Masias's falsification of records and subsequent dishonesty as having "created a lack of trust" and as having jeopardized "Judicial's financial records and

4

systems" during the OSA Annual Audit. The Notice gave Masias an ultimatum to resign by November 15, 2018 or be terminated. Rather than choose either course of action, Masias requested and was granted leave by Ryan under the Family Medical Leave Act for a period of 12 weeks, and later extended through March of 2019.

11. As part of the OSA's Annual Audit, Justice Coats signed off on a management representation letter dated December 7, 2018, attesting to the Judicial Department's financial controls. Justice Coats did not require that this compliance letter be amended, or take any other action, to indicate to the OSA that the Judicial Department might consider a post-resignation contract with Masias.

12. On December 14, 2018, at an unscheduled meeting with Justice Coats attended by Rottman, Ryan, and Eric Brown, the Director of Human Resources for SCAO, Brown indicated that Masias felt her termination was unfair and that she could raise prior incidents of misconduct or discrimination by judges and staff resulting in lesser or no punishment, which could put the Judicial Department in an unfavorable light. Justice Coats recalled that, after reciting three or four such allegations, which Justice Coats asserts he discounted as obviously false or inconsequential, Brown asked whether Justice Coats wanted to hear any more. Justice Coats also recalled that when Ryan failed to respond to Justice Coats's inquiry whether there was any reason for him to hear more, Justice Coats simply told Brown he did not need to hear more because such information would not affect his evaluation of Masias. In conjunction with Masias's apparent complaint regarding unfair treatment and her medical issues, Justice Coats recalls directing that Masias be reassured that "nobody's trying to hurt [Masias]." Others recall these events differently. Justice Coats asserts that he was not aware of the notes Brown was using at the meeting, what the press later called the "Brown Memo," which referenced other allegations of discrimination or undisciplined misconduct spanning more than 20 years.

Justice Coats further asserts that he and the rest of the [Supreme] Court did not learn of the Brown Memo until much later, after Ryan's departure from the SCAO.

13. At that meeting, Brown subsequently raised the question whether a training contract with Masias might still be a possibility. Justice Coats again agreed that he and the Supreme Court would consider approving such a contract, so long as no additional misconduct by Masias came to light.

14. Following that meeting, Justice Coats states that he was concerned that Brown might proceed with Masias on his own regarding a post-resignation contract. As a result, Justice Coats left Rottman a voice message, which was saved, instructing him to emphasize to Brown that he could make no representations to Masias, and Justice Coats recalls having similarly emphasized to Ryan in a phone call that any future contract with Masias could be entered into, if at all, only after she had resigned and only if the contract could be executed in strict compliance with all applicable statutes, rules, and departmental policies.

15. Justice Coats agreed to a recommendation from SCAO staff that any contract to replace the fast-expiring existing leadership training contract should be put out for bid via a Request for Proposal ("RFP"). Justice Coats reports that as Chief Justice, he had no role in the RFP and only later was informed by Ryan that it had produced no bids and therefore a sole source determination for a contract to Masias was permissible. Several investigations have uncovered improprieties underlying this RFP which are beyond the scope of this [Amended] Stipulation.

16. On March 1, 2019, prior to Masias's resignation, Justice Coats was made aware that the hard drive on a M[ac] laptop, for which Masias had received authorization to conduct office business, had been corrupted such that no information on it was recoverable. Although it was explained to him that this could result from various

6

causes, and Justice Coats ordered further analysis, the actual cause remains unexplained. Justice Coats believed it possible that Masias, or someone acting on her behalf, intentionally wiped the laptop to destroy evidence of misconduct—but this belief did not cause Justice Coats to reconsider contracting with Masias.

17. Throughout March of 2019, the SCAO legal staff negotiated Masias's separation agreement with Masias's attorney. Justice Coats asserts that as Chief Justice he was not involved in these negotiations, did not see the executed separation agreement until after Ryan's resignation, was not aware that Masias's attorney had unsuccessfully sought the promise of a training contract as part of that agreement, and was not aware that Masias's attorney had *successfully* sought the promise of a post-resignation meeting with Justice Coats regarding the training contract as part of those negotiations. Masias's resignation became effective March 19, 2019. Had Justice Coats personally reviewed the executed separation agreement, he likely would have learned of Masias's surreptitious recording of former Chief Justice Nancy Rice, information which would have (and eventually did) cause him and the full Supreme Court to determine that a contract with Masias was inappropriate.

18. On March 21, 2019, Justice Coats met with Masias, Ryan, and Rottman in his chambers for discussion of Justice Coats's vision of the kind of training he considered necessary for the different job categories in the Judicial Department and a briefing on what kind of training Masias was prepared to provide. After this meeting, Justice Coats understood that the State Court Administrator, acting on behalf of the Judicial Department, would negotiate a contract with Masias.

19. On April 15, 2019, a month after signing her separation agreement, Masias emailed the entire Judicial Department that she was resigning as Chief of Staff due to a very serious health condition. On the same day, Justice Coats

and the rest of the Supreme Court received an anonymous letter alleging all manner of misconduct by Masias, as well as Ryan, Brown, and David Kribs, Chief Financial Officer of the SCAO. Justice Coats and the Supreme Court had particular concerns about one allegation regarding a separation agreement with an SCAO employee, which included a lengthy period of administrative leave with pay, as to which Justice Coats asserts neither he nor anyone else on the Supreme Court had been made aware. This employee had been accused of conducting improper surveillance of personnel in the Carr Center, including Masias and Brown. Specifically, the letter stated: "[This employee] disappeared one day because she was watching Mindy Masias and Eric Brown. She has been paid for months to not disclose what she had."

20. After discussing this letter with the Supreme Court, Justice Coats therefore convened a meeting with Rottman, Ryan, Brown, as well as Terri Morrison and Beth Robinson, two members of the SCAO legal staff. Justice Coats learned that Masias had structured and negotiated the separation agreement with the employee, which was then approved by Ryan. The separation agreement included a non-disclosure provision. Justice Coats considered the agreement outrageous, said it was one of the "stupidest" things he had ever heard of, and was outraged that the Supreme Court had not been informed. Justice Coats demanded that in the future he be informed of all but the most mundane personnel actions. Justice Coats recalls that shortly after convening the meeting with SCAO staff, there were additional concerns about the allegation when Attorney General Phil Weiser called Justice Coats to say that the Controller was raising a similar allegation among employees in his office, that the allegation appeared very serious, and that the allegation warranted special attention. In response to direct questioning, however, Justice Coats recalls Ryan assuring him that the separation agreement may have been an overly cautious attempt to prevent a lawsuit but was not improper in any way. Justice Coats also recalls Morrison

8

advising him that the separation agreement itself did not violate any applicable laws. Justice Coats therefore did not consider these anonymous allegations sufficient to foreclose consideration of Masias for the post-resignation contract.

21. On May 16, 2018, Justice Coats received a written notice from the OSA triggered by the April 15 anonymous letter. The OSA's notice advised Justice Coats that it had received the anonymous letter and, by statute, all tips concerning employment fraud require formal investigation, which could be conducted either by the OSA or the State Court Administrator. By letter dated May 29, 2019, Justice Coats advised the OSA that he and the Supreme Court had received the anonymous letter, looked into the allegations, and consulted with the Attorney General. Justice Coats requested that the OSA conduct the formal investigation.

22. Even though there existed allegations of serious misconduct by Masias, the veracity of which were subject to a barely begun formal OSA investigation, neither Justice Coats nor the Supreme Court ordered a halt to the consideration of Masias for a contract. Relatedly, when responding to the OSA inquiry whether it or the SCAO should conduct the investigation, Justice Coats did not mention that the Judicial Department was also close to finalizing a post-resignation contract with Masias.

23. Undisputed evidence reveals that Ryan, on behalf of the Judicial Department, entered into a contract with Masias on April 11, 2019, before the Judicial Department received the anonymous letter. Justice Coats asserts he had no knowledge of Ryan's execution of the contract in April. However, on June 3, 2019, with Justice Coats's and the Supreme Court's knowledge, Ryan publicly signed the same training contract on behalf of the Judicial Department with Masias. The contract contemplated a five-year arrangement with the Judicial Department paying Masias between $2,660,000 and $2,750,000 with an

9

allowance for Masias to seek additional reimbursement for pre-approved travel and other expenses. Because the contract, however, provided duties for only a single year, Justice Coats was assured by the SCAO legal staff, in writing, that the contract committed the Judicial Department to pay for Masias's services for no more than that single year and was therefore a one-year contract.

24. On July 15, 2019, Justice Coats personally learned for the first time that Masias had surreptitiously recorded a conversation with former Chief Justice Rice concerning the reasons she had not been chosen to be the State Court Administrator. In March 2019, Justice Coats was aware that Masias had signed a separation agreement with the Judicial Department. Had Justice Coats exercised due diligence by obtaining and reviewing the final separation agreement, he could have learned of the recording earlier, prior to the execution of the contract with Masias. After Justice Coats discussed the matter with the Supreme Court in July 2019, consensus was reached that a contract to teach judges could not be fulfilled by someone known to surreptitiously record them and that the Court no longer had confidence in Ryan. It was therefore agreed that the Judicial Department should withdraw from the contract and that Ryan should resign, both of which occurred in subsequent days.

## II.     Stipulated Admissions to Judicial Misconduct

¶ 5     Former Chief Justice Coats failed to "perform judicial and administrative duties competently and diligently," as required by Canon Rule 2.5(A) of the Colorado Code of Judicial Conduct. By allowing the Judicial Department to contract with the former Chief of Staff after she had resigned in lieu of termination from the SCAO, former Chief Justice Coats undermined the public's confidence in

10

the integrity of the judiciary and failed to exercise diligence in the performance of his administrative duties.

¶ 6    That is, former Chief Justice Coats allowed the potentially multimillion-dollar contract to be awarded to an employee the Judicial Department had earlier been willing to terminate for falsifying an invoice, despite having set a standard that the contract would not go forward if additional causes for concern arose and having subsequently learned of strong circumstantial evidence of misconduct on Masias's part that demonstrated dishonesty while she was still employed with the SCAO. That circumstantial evidence included the meeting about Masias's "knowing some bad stuff" about the Judicial Department, Masias's corrupted laptop, and Masias's role in the surveillance-related separation agreement that Justice Coats considered outrageous and by which Masias was alleged to have used state funds to silence a witness to her own conduct. Particularly concerning is that former Chief Justice Coats was separately contacted by the Attorney General and the State Auditor to advise him of the need to investigate the April 15 letter's allegations, which included Masias, but he did not notify the Attorney General or the OSA about the contemplated contract with a subject of the allegations. Nor did he await the results of the OSA's formal investigation before approving the post-resignation contract with the person being investigated. Although former Chief Justice Coats authorized withdrawal from the contract immediately upon his learning of Masias's

surreptitious recording of former Chief Justice Rice, compliance with the Colorado Code of Judicial Conduct required that former Chief Justice Coats prevent the Judicial Department from entering the contract prior to its public execution in June 2019.

¶ 7    By way of mitigation, the Commission acknowledged that former Chief Justice Coats made many of these decisions with, or based on the representations and recommendations of, the State Court Administrator, fellow judicial officers, non-lawyer professionals, and lawyers.

### III.    Stipulated Resolution of Formal Proceedings

¶ 8    RJD 37(e), titled "Stipulated Resolution of Formal Proceedings," allows the Commission to file a "stipulated resolution" as a recommendation to the Special Tribunal in a disciplinary proceeding.   In filing such a stipulation, the Commission has authority to recommend, among other possible sanctions, that the Special Tribunal "censure the [Justice] publicly . . . by written order."   RJD 36(e); *accord* Colo. Const. art. VI, § 23(3)(e).

¶ 9    Under RJD 40, after considering the evidence and the law, the Special Tribunal is required to issue a decision concerning the Commission's recommendations.   If the Commission recommends adoption of a stipulated resolution, "the [Special Tribunal] shall order it to become effective and issue any sanction provided in the stipulated resolution, unless the [Special Tribunal]

12

determines that its terms do not comply with Rule 37(e) or are not supported by the record of proceedings." RJD 40.

¶ 10   By the Amended Stipulation, former Chief Justice Coats waived his right to a hearing in formal proceedings and review by the Special Tribunal and agreed with the Commission's recommendations that he be publicly censured. (Pursuant to RJD 6.5(a) and RJD 37(e), the Amended Stipulation, the Commission's recommendations, and the record of proceedings became public when the Commission filed its recommendations with the Special Tribunal.)

¶ 11   The Commission noted that it often seeks an award of fees and costs in disciplinary matters. The Commission also noted that the expenses of this investigation were unusually high due to obstacles it encountered. But the Commission found that former Chief Justice Coats was cooperative in the investigation, and it did not attribute the obstacles to him. In light of his cooperation, the Commission does not seek fees or costs in this case.

¶ 12   Upon consideration of the law, the evidence, the record of proceedings, the Amended Stipulation, and the Commission's recommendations, and being sufficiently advised in the premises, the Special Tribunal concludes that the terms of the Amended Stipulation comply with RJD 37(e) and are supported by the record of proceedings. Therefore, the Special Tribunal orders the Amended Stipulation to become effective and issues the agreed-upon sanction.

¶ 13    The Special Tribunal hereby publicly censures you, former Chief Justice

Nathan B. Coats, for violating Colorado Code of Judicial Conduct Canon Rule

2.5(A).

The Special Tribunal:

Hon. David M. Furman

Hon. Anthony J. Navarro

Hon. Elizabeth L. Harris

Hon. Rebecca R. Freyre

Hon. Craig R. Welling

Hon. Jaclyn C. Brown

Hon. Christina F. Gomez